All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and His Honorable Court. Good morning. The first case this morning is 06-1312-1343, Mitutoyo Corporation v. Central Purchasing. Mr. Friedman. Good morning. May it please the Court. In this case, the district judge got a couple things right, but he got a lot of things wrong. What he got right, in our view, was his finding that Mitutoyo was not entitled to lost profits, and what he also got right was that MAC had no standing. But the rest of it he got wrong. He was wrong with respect to infringement. In a strange way, he was wrong by denying a jury trial on the issue of damages. In other words, having found infringement, a finding we disagree with, he was wrong by not granting a trial on willfulness. There is no disagreement about the willfulness, right? But on the willfulness matter, both sides agree that it needs to go back. We agree that given the finding on infringement, there should have been a trial on willfulness, and there should have been a trial on damages. And when this district judge for some reason decided to just decide these issues on papers, Mr. Short made a motion for reconsideration on those issues, on the procedural issues. We were not going to oppose that motion, and within 45 minutes of him filing the motion, there was an order denying this motion for reconsideration. So in our view, just to take a broad look at this, this court which has de novo review of the summary judgment motions on infringement, ought to come to the conclusion, based on the undisputed facts, that there is no literal infringement. And I would suggest also that there is no infringement under the doctrine of equivalence. Should this court come to that conclusion, that's the end of it. But in the event the court either affirms the finding of literal infringement or remands for further consideration on infringement, then I think the issues of damages and willfulness are thrown back open and may ultimately go to trial. You may want to get right into that now. You may want to get to the merits of what you're arguing. With respect to literal infringement, when you wade through all the electromechanical technology, I think it's fairly simple. The claim construction, which was an agreed upon claim construction, actually what happened was they proposed it and we accepted it, makes it very clear that phase angle is the amount by which the received signal is displaced or shifted in time relative to a supply electrode signal. Two clearly identified signals whose phase angle are to be compared with each other. There's no dispute that in the accused devices, that's not the way it's done. In the accused devices, a resultant source... You say the reference signal is not a supply electrode signal, right? You think those two things are different. That's correct. But they're generated from the same clock, right? They come from the same source. And while they may be different in frequency and amplitude and a number of different variables, they're not different in phase at all. At least there seems to be no evidence whatsoever that there's any difference between those two signals with regard to their phase. And that's the only characteristic we're measuring. Well, first of all, they're different in shape. One is a square wave signal and one is a sinusoidal signal. They're also different in purpose in the sense that, Your Honor, the supply electrode signals go a different route or are demodulated, the frequency is changed. Yeah, but none of that affects their... And the time they're going to be compared in the detecting and counting area, their phase has to be the same. Has to be. Because if it's not the same at that point in time, this caliper wouldn't work. Right, and the resultant square wave is therefore compared to the reference signal in the detecting and counting portion of the circuitry. That's correct. But we're only worried about phase position. If those phases are the same, why are we worried about whether or not there's a conversion? That's not part of our claim here. Our claim is just worried about phase position. And the difference between a square wave and a sinusoidal wave is irrelevant when we're talking about phase position. Am I missing something there? Maybe. Tell me what it is. The way that we read the claim construction is that for there to be infringement, it is clear, at least to us, that the received signal is to be compared. I'll use compared. It's actually displaced in time or shifted in time. But the received signal and the supply electrode signals are to be compared. That's what we understand the claim construction to require. Now, of course, our position is you can't do that, but nonetheless, that's what the claim construction requires. And if that's what the claim construction requires and we don't do it, then we don't infringe. Counsel, it says the claim says the amount by which the received signal is displaced or shifted in time relative to the supply electrode signal. It does not say there needs to be a direct comparison between those two signals. It says you need to determine phase position by figuring out the displacement in time between those two signals. So why can't you use a proxy if we know the phase is identical between the proxy and the received signal and use a proxy between the supply electrode signal and the resultant square wave signal? Well, because in our device, Your Honor, there is nothing that is being compared to the supply signal or any derivative of the supply electrode signal. And it's therefore our view. I'm afraid I just interrupted you. No, no, go ahead. It's our view that because there is nothing that's being compared to the supply electrode signal that the claim is not being infringed because the claim construction requires that such a comparison or process be made. I don't see that. I see it says determine phase position by the amount to which the received signal is displaced relative to the supply electrode signal, i.e. the phase angle. So what that says to me is you need to know the phase angle or how much displacement there is in time between these two positions. But it doesn't say you have to necessarily use these two signals if you have a proxy signal that has the exact same phase that's guaranteed to have the same phase. Why can't we use that? Why isn't it the same? Well, I don't think with all due respect that that's what the claim construction says. If the claim construction was intended to cover what your Honour just said, the claim construction would have said so, which is to say, which is to identify that it can be done also by comparing proxy signals, to use your Honour's term. It could have said that. Counsel, you want us to read the words direct comparison into this, and the claim construction doesn't say that as stipulated to by the parties either. It just says you've got to figure out the displacement in phase between these two signals. It doesn't say you need to do a direct comparison. So you would like to reword that claim construction as well. No, it doesn't say direct. I would agree with you, Your Honour. But what it does say, we contend, is that something has to be compared to the supply electrode signal. And in the accused device, there is nothing that's being compared to the supply electrode signal. There are other signals that are being compared to each other. If the claim construction means what I say it does, then there is no infringement either literally or doctrinal equivalence. If, on the other hand, the claim construction is changed, and it talks about proxies and surrogates and comparing other signals, then we may achieve a different result. But in my view, that requires changing the claim construction. Well, the supply electrode signal, if we know for certain that the reference signal has the same phase, and the claim construction says displaced or shifted in time relative to a supply electrode signal, and then in brackets it says the phase angle, if we know what we're getting at is the phase angle, and it says use the phase of the supply electrode signal, and we know that phase is identical to the phase of the reference signal, I guess I just don't see that that isn't consistent with this claim construction. In our view, and I see I'm already in my rebuttal time, in our view, that is an expansion of the claim construction. I would like to reserve my time. All right. Mr. Short. Good morning, Your Honors. May it please the Court. I want to first address the overview given by counsel. We agree that the case should be remanded for a jury trial on willful infringement and lost profit damages. We believe that we did not appeal the reasonable royalty finding as the minimum damages, and Central did not appeal that. So how could you get lost profits, let alone at this high a reasonable royalty when the prices on the products are so different? They're obviously dealing in an entirely different market segment. How could you show you would have made every single sale at a highly different price? Well, first of all, we're not claiming lost profits on every single sale. We're going for our, we requested our market share lost profits. We put forth evidence which is uncontroverted on our market share, and we've shown that there's a market niche for digital calipers. Digital calipers are the only instrument which can reliably, accurately... We know that, but just get to the point. They're selling in the double digits, you're selling in the triple digits in terms of price. How can something with that vast a price difference be in the same market segment? Because there's a niche, and this is the only tool that will work. And if someone wants to buy a digital caliper for that use... They're selling to people who work in their home doing home repairs. You're selling to rocket scientists. What is the same? What's the similar? We disagree. It's just different products. They look the same. If you look at the pictures, they look exactly the same. The price range overlaps. If price is the only issue a purchaser wants to look at, he says, I'll make $25 in my pocket, I'm going to buy a digital caliper. Well, he can buy a less expensive Mitutoyo. He doesn't have to buy the $400 Mitutoyo. He can buy the $40, the $36. Counsel, like Judge Rader, I'm struggling with this. I looked over your reports in this case, and they troubled me because they're very conclusory. They show no elasticity in demand whatsoever, which is exactly what Judge Rader is saying. There's no evidence in this record that people who bought the $40 one would have bought the $400 one, except for some conclusory testimony of your expert, and that's it. There's no showing of the market elasticity in demand from an economic standpoint. I respectfully disagree. There's testimony by Mr. Fowler, who is the president and CEO and 100% owner of it. Can you show us in the record the demand curve for these products? We did not do a demand curve. How can you do an economic analysis without? I think that's what Judge Moore just asked you. Because there— You want just an expert to stand up there and say, oh, yeah, they would have bought the same thing. We're not relying on expert testimony at all. We're basing it on factual evidence of people who are in the industry saying that if Central wasn't there, they would have bought Mitutoyo. We have Mitutoyo's largest distributor writing emails continuously saying these Central calipers are 100%— You're saying that somebody who would buy a $400 caliper is going to go shopping for a replacement, and they'll buy a $40 one. Or vice versa, somebody's going to buy a $40 caliper, and they say, oh, well, look at this $400. I think I'll buy that one. It's the same thing. No, he can go buy the $40 one from Mitutoyo. If the price is so determined that he can go and buy the less expensive Mitutoyo, they come in different sizes. They come in different features. Yeah, but you're selling on the upper end of that market. They're selling the $40 Mitutoyo. You're right. Why are they going to buy an expensive one when they are shopping for a $40 one? We're going for our market segment, Your Honor. Price is the only determining factor. There is a Mitutoyo caliper that overlaps the price range. And there's the other evidence. Mr. Fowler, I was discussing, there's the distributors. There's the fact that these are the only tools. I mean, if a person wants to measure a diameter or another dimension of an object, then this is reliably, accurately— The only option is a dial caliper, which is impossible to read unless you're supposed to be training. Now, usually in the hand tool market, the record shows that the royalty is around 5 to 7 percent. This is three, four times that? There was no evidence in the machine tool market that the royalty is usually 5 to 7 percent. In fact, they delayed. They offered some licenses of their own. Their experts said they didn't even rely on them. So there's no evidence in this case that the machine tool market is 5 to 7 percent royalty. And there's other factors. Mitutoyo had refused licenses to anybody. They wanted to be the only one selling this type of digital caliper in the United States. I've tried many cases. Every time we get to reasonable royalties, they always say, we would have never taken a royalty. That isn't the question as to whether or not you would have taken a royalty or not. The question is, given that you have to have a hypothetical negotiation, what would it arrive at? Exactly, Your Honor. And when Mitutoyo and Central Purchasing sat across the table from each other, Mitutoyo knew what its operating profit was. It knew that it sued and stopped many other Chinese people from importing these Chinese calipers. It spent a lot of money doing that to preserve the market for itself. A lot of these people had asked for licenses, making the same arguments. Mitutoyo had always refused a license, even to some big retailers, such as Pep Boys, who would have had a huge market. All of that's irrelevant, of course. All of that's irrelevant, of course. Get to the point, why would this royalty have been so high? Even your rule of thumb is that royalties don't exceed 25% for almost any product. Well, the rule of thumb is... Is a rule of thumb, obviously, and it's criticisable because it is a rule of thumb, but you're still above it. So you're raising some kind of concern right out of the bat, and then the question is, do you have adequate record to show demand curves, to show that, well, yeah, actually, this is that exceptional case that goes above? And I don't see it. Well, we respectfully disagree. A demand curve is theory. Some economist is looking at certain facts and doing a demand curve. But it's facts, at least, and I don't see the facts. All I see is opinion, people saying, well, yeah, I think they would have bought it. We have a non-agent of the party, Mr. Fowler, who has no connection with either side. He says his calipers competed with Minatoya's and Central's. That's a person in the market with no interest. He's not an economist or an expert in that regard, but he's testifying as to what he sees in the market every day. He sells these calipers, and that's what he encounters. We have the complaints, the biggest customers saying, these guys are really hurting us. Please stop. We've got the history between the parties. This is the second lawsuit between these parties. When they sat down in May 2002, it wasn't a, oh, how are you doing, wouldn't have been a, oh, how are you doing meeting. It would have been, we stopped you once. You agreed to stop selling infringing calipers. You switched to a different Chinese supplier. Let's talk about economics again because that's where we're at. You talked about gross profits. You don't use gross profits to calculate royalties. You use operating profits. Why were you using that different figure, which is, of course, very inflated? In the analytical approach, you do look at the gross profit margin. Then you take out, of course, what you need to to get to operating profit or even the net profit, which is where you do your royalties calculation. In this case, the anticipated gross operating profit margin for Central was 70%. I think they say that they're- Then you take out the administrative expenses, and you get to operating, and then you take out the taxes, and you get to net. But those are the two you use, operating and net. Why are you using gross profits, just because the numbers look big? We used operating profits for Minitoias. We used gross profits for them under the analytical rule, not because the number's higher, because it doesn't matter whether you use gross or net because the differential is still the same. If you take out- If you take 70% minus what their fixed profit or the variable cost were, I think they said it was 29 or 39%, you still have well above 29% as their net profit, as their anticipated net profit. So they could have paid 29.1% to royalty to Minitoia and still made their net profit above that. Furthermore, they could have raised their prices if this was such an issue with them, the profit margin. Counsel, why should HFTUSA sales be included in the base? I mean, they're not related in the parent subsidiary sense to the infringer, are they? Now, that's a little misleading in Central's briefs. Central made sales to Harbor Freight. I can't remember the initials. I just called them HFC. Sorry, my shorthand. Harbor Freight. All right, we'll try and talk the same way. Go ahead. So those sales are of the infringing product. The only dispute as to whether the royalty base should be the retail amount that Harbor Freight sells them at or the amount that they paid Central for. There's not dispute that the Harbor Freight sells. Oh, I agree. No, I agree that ultimately they're going to have to pay a royalty if they're infringing somewhere on those products. The question is should it be the lesser amount that Central sells them to Harbor Freight or the greater amount, which is what Harbor Freight retails them for. And I think our Allen Archery case is the closest on point I was able to find and in the Allen Archery case where we did award the higher rate, it was because it was apparent in a subsidiary. There were several distinctions between this case and that one, and so I'm just trying to understand because it's a $1.86 million difference in the royalty base. No, I don't believe that's correct. Well, okay. They represent that, but they're subtracting out all the sales, not just the price differential. Okay, well, in any event, the price differential is what I'm focused on, and so I want you, if your position is we should get the entire royalty base on the retail sales that Harbor Freight sold, I want you to explain to me why. Sure. Because it seems to me it should be on the price that Central sold them to Harbor Freight for. Right. First of all, they are affiliated companies. They have common owners, they have common board of directors, they have common officers, so there is an affiliation. Affiliated in what sense, though? A formal corporate affiliation of some kind? Affiliated just because, you know, what if I served on the board of two companies? Does that make those two companies affiliated? No, of course not. It just makes me affiliated with both of them. So what is their corporate affiliation? I think there's no parent subsidiary, but I think when you have overlapping directors, overlapping officers, then that's related. They also operate stores under the same trade name, and Harbor Freight buys all of its products from Central, as they say in that brief, all of its products, calipers. Why didn't you bring Harbor Freight into the suit, then? Why didn't you sue them along with Central, and then you could have gone after the retail sales? Because I know you're going to get the short end of the stick because the exhaustion doctrine is going to apply. I mean, if we give them Central's pricing rather than Harbor Freight's, you're not then going to be able to sue Harbor Freight. Because when we deposed the M30B6 witness, we gave the documents, are these your sales? Yes, they are our sales. Those are our sales amounts. There was no way for us to mark out what was Harbor Freight retail versus Harbor Freight, what they paid Central. We couldn't do that, and you still can't do that on the record. Moreover, the expert even admitted that when you do negotiations in a party, it's common to say that the final retail price is the royalty base. You're not limited when you negotiate across the table a reasonable amount, or even in the actual world, to saying, well, we're just going to look at the retail price at the wholesale price. Well, that's relevant to determining the royalty percentage, not relevant to determining the base amount that the royalty should be applied against. I would respectfully disagree. I think oftentimes you negotiate a license, and the retail value is the royalty base, not the… Well, you've used up most of your reply. Do you want to save the last couple of minutes? I'll save my two minutes and 19 seconds. Thank you. Mr. Friedman? Thank you. I just want to briefly address the Harbor Freight. Harbor Freight is not an appropriate basis for determining the amount of royalties. This was called before. They're separate companies. They're not subsidiaries. They do share some executives. Central provides consulting services for which it's paid a fee. They're really separate, and their sales ought not to be included. And they're not a party to this case, unlike in the Allen case. But the one point that I want to make is that in the record, and I can find the references if necessary, sales are broken down of calibers by Central on the one hand, or Harbor Freight Tools USA on the other hand, because they're broken down by store. And I don't recall precisely where the reference is in the appendix, but the sales are broken down. And, of course, as we argued in our brief, Harbor Freight Tools sales should not be included in determining the basis for the royalty calculation, although the amount of sales that Central makes to Harbor Freight ought to be included if there's infringement and if there's liability. So I think that that's just another case where the district judge missed the point. With respect to lost profits, I think that this is not a case where the price differential is very small. This is a case where the price differential is very large, and in some models as large as 600%. And I think it defies common sense to suggest that if the $20 caliber were not available, that a hobbyist, that somebody who was a do-it-yourselfer would go out and pay $120 for a caliber which he may use maybe once a year. I mean, if you bring a common-sense analysis to the lost profits issue, you, in this case, reach the same conclusion that the district court did. I have nothing else I need to add on. Can I ask you one more question before you sit down? Sure. Which is just... I'm going to drag you back to this phase thing again. Even though I ate up all your time on it last time. Well, I'm struggling with this. And hey, if you win this, everything else goes away for the most part. So I do think that they have stipulated to what is not a very good claim construction for them. And I don't understand why, but I don't know the strategy behind why you make your decisions. I don't blame you. Just so I understand, though, and I do understand your direct comparison and that this is not a supply electrode signal, but you do agree with me. I'm not crazy, right, with my electrical engineering degree, that the supply electrode signal does carry the same phase as the reference signal. I understand there are two different signals, but they do have the same phase. They've generated from the same clock. They have different pictures and different frequencies. As I understand it, and based on my philosophy degree, there are... The supply signal, as we're using it, actually is eight signals. The reference signal is one signal. The phase of the reference signal is the same as one of the eight signals. But I actually had an opportunity to think... Hold on, let me ask you one other quick question because you've got 30 seconds left, and we sort of abide by a real strict rule here. So the resultant square wave and the received signal, which you say are different, and I recognize under the claim construction they're not identical, but those also have the same phase, the reference signal and the resultant square wave signal. Yours is, of course, the resultant square wave. The claim refers to... I'm sorry, received signal. I said it wrong. The received signal and the resultant square wave signal, again, same phase there, right? I think so. Okay. I don't... Can I take one second? I don't think so. All right. Thank you. Mr. Schultz. Thank you. Desmore has it right on point. The received signal is displaced the same amount from the reference signal and from each of the supply electrode signals because the received signal and the supply electrode signals have the same phase information. The supply electrode signals are just put on a carrier, a high-frequency carrier, to facilitate the movement through the capacitors. And as to the harbor freight issue, which is the second issue that counsel addressed on his rebuttal time, I direct you to page 48 of our red brief where we reference the point where Central's 30B6 witness said that those were Central's sales dollars. So we have no input. We have no information to use other than that as a royalty base. And in the second paragraph on page 48, we discuss where the designee admitted that the Central to Harbor Freight prices were not provided to Mediterranean. I have nothing further. Thank you. All right. Thank you. Obligation submitted. Thank you.